Good morning. We have four argued cases this morning and the first of these is number 12-1659 HTC CORPORATION v. IPCOM. And Mr. Stockwell, before we start the time here, you should stand up. There's a problem with respect to your confidentiality markings in the blue brief, which marks things which can't properly be confidential and also seems to be inconsistent with the confidentiality markings in the red brief. Is there any need to have any of this material in the blue brief marked confidential at all? Your Honor, when we marked our brief, we marked it and sent it to HTC's counsel and asked them, you know, to de-designate more portions of it. They informed us they could not in part because there is a third-party Qualcomm that had some objections. I understand that since then they worked with Qualcomm and de-designated more in their reply brief. But I'm not in a position to say we can de-designate what is in our red brief because that's really HTC and Qualcomm's confidential information. Well, to add one point, I have conferred with counsel this morning about certain things that I would like to refer to during the course of argument and understand there's no objection to that. So, as I understand, there are no confidentiality markings in the red brief. There are, in fact, a few, Your Honor. Well, the cover of the brief is not labeled confidential. The version I have says Apelli's confidential response brief, Your Honor, and I have some. Our copies of the red brief do not have any confidentiality marking on the cover. Your Honor, we will look into this as soon as we can. The version that I have does, in fact, say Apelli's confidential response brief, and there are some markings. Just to clarify, Your Honor, as Mr. Stockwell had indicated, HTC has vendors that supply the chipsets TI and Qualcomm, and so the confidentiality markings are based upon what they had indicated had to stay confidential. Why don't the two of you sit down and work this out and find out what the explanation is for the fact that we have a red brief with no confidentiality designation on the cover? And I would point out to you that whatever confidential information there is in there, there's still improper confidentiality markings in the blue brief, and I'll give you an example. On page 55, it says that was error because the recognition of equivalency by skilled persons is significant, citing cases. And part of that sentence is marked as confidential. That can't possibly be confidential. We've sanctioned people for that kind of confidentiality marking. And, Your Honor, again, counsel conferred about this. I think there was a concern originally that this is referring to the Qualcomm memo. Well, it doesn't make any difference. This sentence is just reciting a well-known legal principle. You are not supposed to mark that sort of thing confidential. So whatever the two of you decide needs to be confidential, you still need to go through your blue brief and fix these confidentiality markings that are improper. You cannot mark legal principles as confidential in the brief. We will do so, Your Honor. Okay. All right. Why don't we start the clock on the argument? Your Honor, I would like to begin, Your Honors, I'd like to begin with the 751 patent. I think the issues there are fairly straightforward. We contend the district court erred by requiring a direct comparison between the access threshold value and the random or pseudo-random number. Now, the claim language that we're dealing with here, there are really sort of two limitations. The first is that the evaluation unit asks when information signals have access authorization data, whether the access authorization data include an access threshold value for comparison with a random number. That limitation was construed as ordinary meaning. The next limitation is the evaluation unit also ascertains as a function of an outcome of a comparison whether to enable the access. Now, we contend there's nothing in the claim that limits the comparison to a direct comparison. And, in fact, the way the claim is written in passive voice, as a function of an outcome of a comparison. You agree there's no direct comparison? Your Honor, I would agree there's no direct comparison in the sense that only the access threshold value is received. Now, formula-wise, the access threshold value is put into a formula. So on one side of the equation is a number derived from the access threshold value, and on the other side is the random number. So, clearly, the number that's being compared is a derivative of the access threshold value. I don't think that's disputed either. But the claim language nowhere says that you have to do a direct comparison. Now, the only evidence, intrinsic evidence, the HTC cited to support the direct comparison argument was the embodiment. And in the embodiment, what the patent talks about is you send down what they call bits, access threshold value bits. They give an example. There's an example at column 7, lines 53 through 60. Actually, the bit pattern sequence is given at line 49, 0100001101. And they say the access threshold value S is encoded in binary format form by means of the access threshold value bits. And then they talk about the priority value. And it says for the access threshold value S, a value of 8 thus results. And then it goes on to talk about the 8 being compared to a random number. Now, we contend that that right there shows that there is also in the embodiment not a direct comparison of exactly and only that which was received from the network. They don't compare that bit pattern to a random number bit pattern. Instead, there is a conversion of the bit pattern to a number. And the number is compared to the random number that's drawn. How does that number – I'm sorry. Go ahead. How does that number – why did they choose that particular number 8? That was simply an example. In fact, the specification says earlier at column 5, you know, it gives as a for instance the access threshold value can take on various numbers, 0 through N. This bit pattern is sent down to represent the N. And then it's converted into a decimal number for comparison to the random number. It's a straight translation, right? When you say that, Your Honor, that's true. But when we think about it mathematically, there's a formula associated with that straight translation just like there's a formula associated with the accused phones. Two formulas. There is a translation of one number that's received – a bit pattern that's received from the network in the patent. There's a translation of the bit pattern that's received by the HTC phones. I guess one could look at it as just a reformatting of the data stream that comes in. You could – I mean, certainly that is HTC's characterization, Your Honor. I don't dispute that. They certainly characterize it that way. We pointed out that in this art, people recognize and see all kinds of examples where bit patterns don't get converted one-to-one but can be set at any number. So, in fact, as the patent says, they've encoded the 8 as a bit pattern, but they could use that bit pattern to represent some other number. And a bit pattern is the only input, right, in terms of doing a comparison with a random number? Well, the bit pattern gets converted to a decimal and then there's a comparison. But I think the question is, is there additional data that's used in that calculation? In fact, there are in other embodiments, Your Honor, that are also within the scope of Claim 13, one of which is there's priority values. No, but in the accused method or system. They're using additional data, right? Well, in the accused system, there is – so there's access classes, 0, 1, and then 2 through 8, okay? So, for access class 0, they don't use anything from the network. For access class 1, they use the dynamic persistence level from the network, put it into a formula, calculate a value. That value is compared with a random number. For levels 2 through 8, they use the dynamic persistence level plus a scaling factor also sent from the network to calculate the number to compare to the random number. And the scaling factor is not mentioned here in the claim, right? No, but, Your Honor, I would say that within this claim covers the embodiment in which two things are sent down from the network to make a comparison. A, the access threshold value, and B, the priority value. So, the claim encompasses doing more than just comparing an access threshold value to grant or deny access. And as our expert explained, all the scaling value does for access classes 2 through 8 is simply apply some different constants to distribute the numbers. So, in our view, the claim construction was error here in terms of the direct comparison. You know, they say, well, encoding is different than actually calculating a number. We would suggest that that's a very slim read given this embodiment, and then effectively the district court read that embodiment out. But as I understand it, they're also arguing that this number is not used to determine access at all, but also only to determine priority and once you achieve access. Your Honor, that is not an argument that I understand they have raised on this appeal. There is a footnote in the district court's decision that says, oh, they have some other arguments about whether access to the channel is actually enabled or not. But they didn't raise those arguments as an alternative basis for affirming the judgment here. They specifically made an argument and made an analogy to the airport lines, whether you get access to the airport versus what your priority is. But, Your Honor, that was in the context of distinguishing the doctrinal equivalence argument that we have for this issue. And our position is that Dr. Mattastetti provided ample evidence for an equivalency verdict here. So, in fact, if they... Well, did he refute the notion that they don't use this comparison for access purposes? Well, absolutely, Your Honor. If you look at Dr. Mattastetti's testimony at A5920 and A5921, A5920, he walks through his analysis as to why the scaling factors and the dynamic persistence level as used by the HTC phones infringe. It's an insubstantial change. In A5921, he does a function way results analysis. And either on that page or the next page, he also references the Qualcomm memo. There was a specific question. Where does he say that they use this comparison for access purposes? So, Your Honor, if you look at A5918, this is where he is addressing element, just Head Note 5, an evaluation unit for ascertaining. He's addressing the entire element there and discussing how the evaluation unit ascertains... Just show me what sentence he says that they use it for access. I'm sorry? Where does he specifically say that they use the comparison for access, for determining access? At paragraph 132, if the test as evaluated by the comparison is passed, the mobile phone is allowed to access the RACH. A comment in the HTC device source code is illuminative, and he cites the comment there at the bottom of page A5918, Your Honor. I believe there are some similar statements elsewhere in his paragraphs here, Your Honor. Your Honor, I would like to move on just to the equivalency point. We covered these points in our brief, but we think the major error in the district court's decision was that she essentially read the equivalency test out and essentially applied the literal infringement test and said, well, Dr. Mattis said he hasn't said there's a direct comparison. Therefore, I'm granting judgment on equivalency. In fact, the pages I just cited were Dr. Mattis' analysis of equivalency, and we also, as discussed in the brief, have the Qualcomm memo, which they attack, but it's still evidence. They attack the weight of the evidence. It's certainly not a mere scintilla and would get us to the jury. In terms of what weight to give to that evidence, I mean, the district court considered it and determined that the weight it was to be given was insubstantial, or certainly not enough to create an issue of fact. Don't we have to defer to that factual determination unless it was clear error? Your Honor, summary judgment is reviewed de novo, and the question at the end of the day is whether a reasonable jury could accept that evidence drawing inferences in our favor. I think it was improper for the district court to weight the evidence and discount the evidence. It's admissible evidence. It's probative on the issue of equivalency. We would contend it's an admission. There would be a fight about that at trial, but that's for the jury to weigh, not for the district court. An admission that the legal standard is satisfying? Your Honor, if you look at HTC's brief on this point, they actually admitted that the document was an engineering document. So we contend that the statement... Yeah, but it's an engineering... There's no evidence that that engineering document was speaking about the legal standard, right? I would agree there's no evidence that it's speaking about the legal standard, but when a skilled person looks at the number they're using, the dynamic persistence level calculation, and says that could be equivalent to an access threshold value, that's an admission from a skilled person of equivalency. You could argue equivalency just means a dictionary definition. HTC has many different definitions, and something can be equivalent in layman's terms or even in engineering terms without being equivalent for the doctrine of equivalence purposes. I understand, and I understand Your Honor has cases involving, this court has cases involving the 510K submissions to the FDA. I would submit this is different. The document was specifically prepared to talk about a design around on this patent by Qualcomm engineers, and says that this feature is equivalent to the access threshold value. When you say this feature, did it say dynamic persistence level, or did it say the persistence value? If you look at the Qualcomm memo, Your Honor, at page A6136, it says the persistence value, which is the value calculated from the dynamic persistence level through the formula, could be considered as equivalent to an access threshold value. So we would contend this is directly relevant to the equivalency case. I have a few minutes left before I'm into my rebuttal time, and I do want to address the 216 patent briefly. I think our essential contention there is that the district court unequivocally changed the claim construction. Now, in reconsideration, the district court denied that. That's something that... Are you not now arguing that the district court's claim construction is finally articulated as incorrect? No, Your Honor. We do contend it's incorrect in two ways. There was no justification for putting in corrected phase course in step 1.2. HTC doesn't really defend that. What they really defend is the ultimate changed construction that a phase course required calculating phase angles. All of that is based on an argument that there's a specification disclaimer. Now, we cited the cases in our briefs... But with respect to 1.2, how was the claim construction changed? Because the court said first that step 1.2 required utilizing a phase course. On summary judgment, we submitted evidence from Dr. Stark, and it's at A6625 and A6450, paragraph 13, A6501 through 08, and figure 22 of his report, where he explained that the way they derotate the samples, they are utilizing the phase course in determining the start of the frequency correction burst. Now... Wait, I don't understand. What does his affidavit or declaration have to do with a change in the claim construction? My question to you was, how was the claim construction changed under 1.2? Okay, so he testified that the claim construction as articulated used the phase course was met, and we submitted evidence on that. The district court rejected the evidence by saying, well, he didn't say that the phase course that was utilized was first calculated by calculating each phase... I'm not understanding this. How does this show a change in the claim construction? What did the district court say first, and what did it say second that changed the claim construction? The construction of step 1.2 was that step 1.2 had to detect a frequency correction burst by utilizing a corrected phase course. We tendered evidence on that, Your Honor, and what the district court said... What does it say, how did it change the claim construction? It changed the claim construction by saying the phase course had to also be calculated with phase angles. That's a change in the claim construction. Otherwise, that point's irrelevant to assessing summary judgment where we've got expert testimony that they used the phase course. Are you saying that you don't have to calculate a phase course in order to use it? That is exactly what our expert testified. He said that you don't have to calculate each phase angle within the phase course in order to utilize it. Because the frequency correction burst has a phase course pattern that the accused device has recognized, and he pointed to the evidence of that and said you don't have to calculate each phase angle to determine that pattern. All you have to do is look for the pattern, and in that sense, you are utilizing the phase course. The district court said that evidence was not relevant because I'm going to construe phase course as requiring calculating each individual phase angle within the phase course. That is what we say is the change construction, and what HTC says is justified based on the disclaimers in the specification. We say there are no such disclaimers when you actually look at the specifications. There's nothing in the specification distinguishing art. There's no prosecution history distinguishing art. If we conclude that the ultimate construction that the court adopted was the correct one, and you're left with only an argument that somehow it was changed, and you didn't have an appropriate opportunity to address it, what else would you have submitted to address the impropriety of that claim? Well, Your Honor, we submitted at page A7701 through A7718, Dr. Stark's supplemental report with our motion for reconsideration. We came in and said, hey, you changed the claim construction in two ways. Yeah, but wait, just so that I can understand. Your point is not that you needed an additional opportunity to address the claim construction. As I understand it, your point is you needed an additional opportunity to bring in doctrine of equivalence evidence if the claim construction was changed. That is exactly right, Your Honor, and that is the evidence which we would have tendered. In essence, we contend the district court gave us no notice as to what the ultimate claim construction was going to be. We went through a claim construction procedure. She had originally rejected the notion that you had to calculate phase angles for anything. They tried to put that in the preamble part of the claim. She rejected that. She came up with this correcting phase force construction. We say that is incorrect, but then at the end of the day on summary judgment, she said phase force requires calculating phase angles. We submitted Dr. Stark's declaration at A7701 and said, look, if you are going to change the rules of the game, as we told her at the summary judgment hearing, we need an opportunity to supplement and provide doctrine of equivalence evidence because for this particular limitation, we agree. We cannot show calculating every single one of the phase angles. We can only show they're utilizing the overall phase course of the signal. What is a phase course if it's not a series of phase angles? In fact, Dr. Stark said that's what it is, right? I agree he said that's what it was, but he didn't say it in a way that was limiting, and if you look at his testimony that I cited, he also says they utilize the phase course. Now, the patent explains that the 142 fixed bits signify a phase course, and if you look at the statement in the patent, what they are talking about, it's at bottom of column 5, top of column 6. 142 fixed bits, fixed identical bits, which signify a phase course, taking account of and correcting phase progression. And then they talk about without taking account of phase progression. All that's talking about is it's 360 degrees. You have to kind of adjust for the fact that it's a cycle that's repeating, okay? So, what the patent says is a phase course is the pattern of bits, which is exactly why Dr. Stark said they're using that pattern of the 142 fixed bits, which gives you this constant tone in order to detect the frequency correction burst. That's what the patent says. We've got a lot of statements in the specification, for example, column 3, line 9, the synchronization method of the invention is based on evaluations of continuously running phase angles. I agree that the specification says that, Your Honor. It says the invention is based on. It does not say the invention is. That is a subtle difference, but it is one this Court has found does not result in a disclaimer. Moreover, claim 2. We've said that based on isn't the equivalent of saying it is the invention. I think you're – I'll correct that, Your Honor. You've said similar terms. For example, the Liebel-Flarscheim case that talks about the principles of the invention, the Rambus case that talks about the multiplex bus as being a – I don't remember the exact language. But if you look at those cases in Liebel-Flarscheim, what the Court's disclaimer law on those types of statements in the specification say is, yes, you look at them, but you need to have something more. You need to have distinguishing the art in the specification or in the prosecution history. And you've got to look at the overall specification. And as we pointed out, the specification here says it's also useful to look at the frequency correction verse and to calculate the angles. And claim 2 specifically talks about calculating the phase angles. It's fine for the specification to enable all claims, Your Honor. Are you saying that if anything that HTC does is to consider the phase angles, that that's the same as using a phase course? Absolutely not. That is absolutely not our position, Your Honor. Dr. Stark provided a detailed analysis at the pages that I cited as to why, when they derotate the phase of the signals and do the summing procedures that are discussed, that is utilizing the phase course because only the 142 fixed bits will give them the signal that they found the frequency correction verse. That was his testimony. The district court discounted it, but that was sufficient to get to the jury. But even if you were to prevail on this particular point with respect to the 216 patent, there are at least two other findings of non-infringement by the district court which would be individually sufficient to support an ultimate conclusion of non-infringement. And, Your Honor, that is certainly HTC's position, but in our briefs, we addressed each of those findings and challenged those as well. I didn't find your discussion of the range issue to be particularly convincing. You want to try to address that? Yes, Your Honor. If you look in the joint appendix, there are some figures at page A7633 through A7634. And these figures are explained at A6539 in Dr. Stark's report and A6506. So, if you would just look at those figures. So, A7633 shows that the way the sampling procedure works is it groups the samples. Okay? So, you see there's a set of... I think you better step back a moment and tell us what it is that you think these figures show. Okay. In terms of the claim requirements. Okay. So, as Dr. Stark explained, what is identified... If you look at 7634, the start of FCB, what that identifies is seven samples that could correspond to the FCB. Those seven samples represent a range in which somewhere within those samples, there's an FCB. We don't know exactly where. And the reason for that is shown in A7633. If you look at the top of the diagram where it says start of FCB. So, somewhere within that sample of seven, you know the FCB starts. But you don't know exactly where. That sample period is, in fact, a range. It is not a point in time or a time index. It is a range of samples that somewhere within the range, the FCB will have started. Is this the argument you had in your blue brief? Yes, Your Honor. And in the reply brief. The argument where the red brief said that these are inputs, not the output. Well, Your Honor, what the output is, is on the second diagram. The output is the end sample that can only represent seven bits or four bits, depending on whether it's a TI or a Qualcomm device. So, Dr. Stark's description of the fact that the end point sample, whatever it is they identify, time index, represents four bits or seven bits, is not disputed. Right. But the red brief said that these were the inputs to figuring out. Certainly, some of them are inputs. But the ultimate output is bounded by the fact that it can only identify a four-bit range or a seven-bit range where the FCB will start. Well, that's what you say. But do you have expert testimony saying that it shows outputs? That is, in fact, Dr. Stark's testimony, Your Honor. Where does he say it represents outputs? If you look at A6505, this is where he is describing the process that results in the sample. Your Honor, I can't represent that he said the word output. I don't understand that to be a limitation of the claim. But he did testify that it only identifies a range of four to seven bits. Okay. Well, we're well over our time, Mr. Stockwell. Thank you. We'll give you two minutes for rebuttal. Thank you, Your Honor. Good morning, Your Honor. We'll give you some extra time if you need it. Thank you, Your Honor. Thank you, Your Honor. I'm Michael Loveline for HTC. With me, I have Dan Bagatelle and Tyler Bowen. Your Honor, I'd be happy to start with either patent, whatever you prefer. We can start with the 216, given that's where we just left off. I want to first note, in response to the question about the standard of review, the main point that Mr. Stockwell seems to be arguing is that the judge changed her claim construction and that they wanted the chance to bring in new evidence. And that's an issue that's an abuse of discretion standard. So I just want to make sure that we're clear on that. The judge provided the claim construction, invited the party. This is, and by the way, provided the claim construction after having a full-day Markman hearing, a full-day tutorial, and then an invitation for both parties to file motions for reconsideration on the claim construction. And made it very clear that 1.2 had to do with utilizing the phase course. And if there was any doubt as to whether utilizing the phase course actually meant… Right. Why does utilizing a corrected phase course necessarily and only mean calculating phase angles, calculating and recalculating phase angles? The issue is a phase course is not downloaded from the network. What's coming down from the network is just a waveform that you detect. And then from that, you demodulate it and you get a bunch of what's called I and Q samples. From that point, you have a choice. You can either use the magnitudes of those I and Q values to do the processing that you need to accomplish some kind of synchronization, or what the invention of this patent is, we'll throw away the magnitudes by using it as a ratio instead. There's a difference between 5 over 4 is equal to 1.25. But we get different information when we say 5 over 4 versus 1.25. And that's the quintessential difference here. Another way to look at it in an easy math problem, if we say 8 times 8 equals 64, I didn't utilize exponentials, even though another way to do that would be 2 to the power of 3 times 2 to the power of 3, and then add up the exponentials. The point is it's math, but it's math that's done in a different way. Well, I understand that, but that doesn't really address the question of whether there was a change in the claim construction. Is it the case that in the original claim construction, she didn't incorporate the phase angles part of it? The court made clear when it construed the claim. Try to answer the question. I'm trying to, Your Honor. Did she mention phase angles in the original claim construction? She used the word phase course. She used the word phase course. So the issue is whether there's any confusion that a phase course is made up of a sequence of phase angles. And what she was persuaded by is the fact that when we deposed Dr. Stark, IPCOM's expert, and asked Dr. Stark how to define what a phase course is, is it fair to say that it's a sequence of phase angles? He said yes, that's fair to say. So she relied on that testimony at that time? That's right, Your Honor. And I believe that that's in her summary judgment opinion. So she says that in order to get to a phase course, you have to calculate the phase angles in order to create the course. I understand how she got there, and she went through the fact to say why she thought that was the case. But their argument is that even if it's true, then, that there isn't direct infringement, that they would have presented additional evidence as to the doctrinal equivalence to show that your Q&I values, essentially, are obtained by looking at phase angles. Right. I appreciate that's their position, and we disagree. Number one, I don't think they could prove doctrinal equivalence, even if they had submitted evidence. But the court found properly that they had their chance, that they submitted an expert. What you're saying, as I understand it, is that while she didn't use the words phase angles in the original claim construction, the testimony that she cited of their witness, talked about the use of phase angles. So they had noticed that phase angles was part of this, and if they wanted to present doctrinal equivalence testimony directed to that point, they had the opportunity to do it. That's right, Your Honor. That's right, Your Honor. And they actually submitted after HCC submitted its rebuttal report on non-infringement, they submitted supplemental reports, but did not address this issue. And they claimed that they were surprised at the end, and the judge disagreed. There's no surprise here. They were on notice, and they were trying to do an end run around the judge's summary judgment. And this concept of a phase course and the fact that what a phase course is is something that's made up of a sequence of phase angles is the quintessential invention of what is disclosed in the 216 patent. One thing I'd like to address, Your Honor, is that, let me pull up the appendix here. If you look at the 216 patent, one thing Mr. Stockwell mentioned is that the prosecution history is a blank on this, and there's an issue about that they weren't distinguishing over the prior art. But what's important to understand is that the patent itself is distinguishing over the prior art. So if you turn to the appendix A-126, the 216 patent, at the very beginning, at A-126, column 1, lines 15 through 20, it talks about the GSM recommendation. That was already in existence. And the point of the GSM recommendation is that you were going to maintain these bit counters, which was cumbersome. And so they say that it had strict requirements, relatively great complication and expense. Then in column 2, it says you've got all these timing of slots, TDMA frames, traffic channel frames, that all have a common set of counters. And they run continuously. And then they say GSM recommendation sets very strict requirements. When we get to column 3, the summary of the invention, and Your Honor asked the question, does it matter that it says based on, rather than saying, you know, is this the invention? They are directly distinguishing from the prior art when they say that in the prior art, you had to maintain base counters, timing counters. But here, the synchronization method of the invention is based on continuously running phase angles. And it says that three times in the summary of the invention, and then walks through the steps, each time showing how we're going to use the sequence of phase angles as a phase course in order to accomplish what they consider to be a synchronization technique. How do you deal with claim differentiation and claim 2? There's two issues, Your Honor. The last point is at A129, it then says we're distinguishing over the base, the time counter method by doing this with phase angles instead. So with regard to claim 2, there's two issues with it. Number one, claim differentiation is a presumption that can be rebutted. And there's plenty of cases that say that we take the patentee at his word. When the patentee says what the invention is, that's in the independent claim. Just like the Honeywell case where there was an issue about what a fuel system component meant, and it was decided that it had to be the fuel filter. So doctrine of claim differentiation is not an end-all rule. It would be unfair if it were. But the other problem is that claim 2 has its own problems. If we took claim 2, it says the synchronization method, it doesn't say wherein the steps above further comprise. No. It says wherein there is performed the further step of calculating the phase angle. That doesn't make any sense. That's actually directly inconsistent with the teaching of the patent. The teaching of the patent is that we're going to use the phase course in every single sub-step. That's how the sub-steps are to be accomplished. If we did it before or as a separate step, that wouldn't get us anywhere. Your Honor, some of the other points that were made about the – I'd like to talk about the range for a moment. But before you get to that, just a quick question on the 3.2 point. Yes. Where they say that the district court did not address the burst or the same burst argument that you're now making in your brief and that they should – even if we adopt the same burst construction, that they should have the opportunity to present documents of equivalence evidence. What's the answer to that? I mean, are they correct that the district court didn't rely on the same burst theory? No, they are not correct, Your Honor. In fact, the judge specifically said that the difference between HTC's phones or HTC's phones with Qualcomm chips and 3.2 is that HTC's phone performs – if they're going to perform fine frame synchronization and fine frequency synchronization at all, they're done on different bursts at different times as part of different procedures. And that was word for word, I believe, what the district judge said. So the district judge did address that. The issue here – But if the claim construction – Okay. The Markman hearing, my recollection, and you can correct me if I'm wrong, is that you had originally proposed the same burst construction and the district court did not adopt that at Markman. What – Is that correct? Not exactly. We proposed, I believe, the same burst construction for 2.1 and that that was not adopted. I think that's what the issue is. But under the court's claim construction, let's start with just the wording of the claim. It says with and it puts it within the same step. That's got to mean something. And the district judge said it means while also. We're going to conduct a fine frame synchronization while also conducting a fine frequency synchronization. Why does why also mean on the same burst? We just look to the patent when it describes the burst structure and it becomes clear. What's happening is when your cell phone is on and you're talking with someone – It can't be exactly simultaneous. It has to be sequential, right? Well, it might do parts of it overlapping in some way. But it can't be exactly simultaneous. But the only way it could be exactly at the same instantaneous bit would be having two processors within a phone, which I don't think anybody does. So the issue is what would this actually mean in accordance with the patent when we say while also? And it has to mean on the same burst because otherwise you don't keep getting bursts when you're in this neighboring cell monitoring phase. You only get it once every 26 frames you get to listen to another neighboring cell. And there's lots of neighboring cells that you have to listen to. So the next time the phone gets to listen to the same neighboring cell could be hundreds or even thousands of frames later. And so if we were to say that these two things, fine frame synchronization with fine frequency synchronization, that could be accomplished even though they happen hundreds of frames later, even though in the meantime in between those two we've been on a phone conversation and we've had hundreds if not thousands of normal synchronization procedures, the phrase would be absolutely meaningless. Not only would with have no meaning in the claim term, but the fact that they're recited in the same step would have no meaning. The reconstruction that IPCOM is arguing is not only inconsistent with the specification, it's directly inconsistent with the claim language itself in two parts. Number one, they're reading the limitation right out of the claim. They're saying for them it would be not 3.1, 3.2, it would be 3.1, 3.2, and 3.3. They're taking one of them and just putting them in a different step. And the reason why that's inconsistent with the claim in other areas is the initial synchronization steps, 1.1 through 1.4. There, fine frequency synchronization is recited as a separate step from fine frame synchronization. So there's a reason why they decided to list them as separate steps there, but not as separate steps for extended synchronization. And the reason why is because in extended synchronization you've got to do it on the same verse because you're not going to get another opportunity for a long time. You wanted to address the range issue? Did you have a question? Just real quickly. You had one argument about the same verse, but then you had an alternative argument that HTC's products take a half a second or something like that in time between doing the two synchronizations. Is that right? Okay. Well, there's two arguments that we made. Number one is that it has to be on the same verse in order to be while also. And if it's a half a second later in cell phone technology, that's an eternity. A burst, by the way, is a fraction of a millisecond. So a half a second is a whole lot of them. The other argument, though, is that if extended synchronization means anything, it means that you're taking these parameters and you're using them. You're using them in order to accomplish handover. That is the whole point of this section, and the patent says so at column eight when it says at line 13, by means of this extended synchronization, certain special cases of initial synchronization are avoided. In this case, it is basically assured that upon leaving one radio cell, the base station of that cell will not interfere with the continuation of the connection. In English, what they're saying is the whole point of extended synchronization is that you get the information from a neighboring cell and then use it as you cross over the boundary so that that way you don't have to start from scratch. Why isn't that the same as your product getting information from the neighboring cell on a periodic basis so that you can prepare for the crossover? Right. So what's happening is, and we have undisputed evidence from Qualcomm's engineer who did the circuitry, who did the code, and he said we expressly considered whether to use frequency information from a neighboring cell when we go over to that cell. When we decided not to use it, it would be very difficult to code that, and it wouldn't be effective because all the frequencies in 1990s… But you're not answering my question. I'm sorry. You concede that you do use the information from the neighboring cell and you gather it beforehand. I see. Okay. The standard requires that you take power measurements of the different neighbors so that that way the… and then report that back to the network. So that way the cell phone can know where it is. If it's getting too far away from its serving cell and getting closer to another, then it's time for the main network to indicate it's time to do a handover. The issue is whether you then use these to accomplish the handover, and the undisputed testimony is that we do not. We do not because we don't need to because all the frequencies of all the base stations these days are very close, and they're close enough. What's the cost of gathering the data from the surrounding stations if you don't use it? Well, you're using it just to get power measurements. So I need to tell, you know, you've heard of cell phone triangulation and ways that they can figure out where you are. It's being used to just show where you are. It's not being used to actually synchronize when I get handed over. It's just being used to tell me I'm getting closer to this cell tower than I am to that cell tower, and that's what's required by the standard. Extended synchronization is more than just taking power measurements. It's ensuring that a handover will be successful. That's what the specification says. Extended synchronization is the terminology that they came up with. When we looked at the specification of this patent, it says this is how we ensure a handover will be successful. Should I move on to the range now? Why don't you? Okay. The range point, I think, is pretty simple. There's a difference between if I know that I run about an eight-minute mile, I can say I run about an eight-minute mile, plus or minus a certain amount. I'm giving some degree of imprecision, but I'm saying I think it's at eight minutes. I've given a point, and then I've indicated the relative imprecision associated with it. That's different from saying I'm going to run a mile between – I should be faster than eight minutes – between seven minutes, 50 seconds, and eight minutes, 10 seconds. That's a range. I've now specified two points. The question is couldn't you take the first information to arrive at the second? You probably could. I'm not saying that they're completely different concepts, but the patent requires that you find this beginning point and this end point. That's the only thing they teach. And when they say coarse frame synchronization, that's a degree of imprecision. It's not necessarily indefinite. We looked at the specification to see how do we arrive at that. The specification shows that we identify a range. They actually included identify a range in their proposed claim construction, so they're not disputing that that should be part of the claim construction. But what they didn't realize is when we look at HTC's code, and this is code not just for the chipsets with Qualcomm, sorry, with Qualcomm chips and the phones, but also the phones with TI chips, it identifies a particular point, but that point is associated with a degree of imprecision. And that's what he's pointing to. He's saying we know that this corresponds to four points, but only one point is actually being identified. And that's what the difference is. And if we look at, I think it's A5482, and I believe this is coming from their report, what we see is this top of the hump. And that top of the hump, that's what's telling us, okay, this is the point that we're going to report back to the processor. And it might be associated with a degree of imprecision, but it's a point nonetheless. That's the difference. If I can quickly move to the 751 patent. Okay, so the 751 patent is, especially in comparison to the 216 patent, it's a pretty easy patent. It's telling us in two places that this issue about direct comparison or indirect comparison, the issue is you can only, when you take two numbers, you compare them. I compare eight is greater than five. And there's this concept of, oh, well, the court changed your claims instruction, and now she's saying direct, and that's not fair. The only thing the patent is about is actually taking one number, downloading it from the network, and comparing it with a random number generated in the phone. They suggest that specification shows the use of additional data in connection with the comparison. Is that true? What they're talking about is, and they give their example about what if you took a number that was downloaded in binary form and you converted it into decimal form. So what? That's completely different than what's happening in the accused product and under the standard. We have to keep in mind, they wanted their patent to cover the standard. The standard didn't adopt it. The standard looked at that their system is completely different because it gives this entire range of flexibility that you can't accomplish with the simple system that is disclosed and claimed in the 751 patent. The big difference is it's one of priority. Under their system, everybody gets an equal chance. It's very simple. You download a number, you compare it with a random number in the phone, and everyone gets an equal chance. And the whole point of HTC's phones and the UMTS requirement is that it affords you all these different ranges of flexibility. If you're really important, then you're going to be associated with ASC zero, and you're not going to get a random number comparison at all. You're going to get through. But that's not all. There's this AC to ASC mapping, which Mr. Stockwell had indicated. There's more than one value that's being downloaded from the network. There's that DPL value, but there's a separate value, and that separate value is going to be used to determine how important you are. And based on how important you are, you get a different scaling factor. And all that's optional, but the phone is configured to do it, to always look for it. And so, therefore, it's a necessary part of the functionality. Now, the Qualcomm memo and the Dr. Mattacetti points that he made about DOE, the judge didn't weigh the evidence for its persuasiveness and then determine, I don't find it sufficiently persuasive. She weighted through the evidence and looked at it for relevance and determined that it was not relevant, and therefore, they didn't meet their burden to show doctrinal equivalence. Let's take them one at a time. First, with regard to Dr. Mattacetti's report, what she found is that he didn't apply the steps that are necessary, the particularized type steps that are necessary to do a DOE analysis, because he didn't want to admit that there wasn't literal infringement. So, he didn't want to go through and actually apply the differences. There's lots of differences between just the general structure of how this persistence value is built than just downloading something from the network. Sometimes there's no random number comparison at all. Sometimes there's a scaling factor applied. That scaling factor is going to differ. There's more than one number that's being downloaded from the network, and all of these work together. And the fact that what's actually being compared, the number that's being downloaded, is used in an exponential, which gives you that different tapered line. He needed to apply all of those differences and explain why all of them are insubstantial, and explain why the result would be functionally the same way. He didn't do that. And he also didn't interpret the Qualcomm memo. All he did about that Qualcomm memo is say, I note that it's there. And the Qualcomm memo doesn't say, we, Qualcomm, determined that this is equivalent to that. No, it says, it could be considered. It doesn't say, we consider it. It says, it could be considered. They deposed Qualcomm over the course of, I think, four days. They deposed three witnesses. They had all Qualcomm's code. They never asked Qualcomm one question about this document, to my recollection. Even the person who they deposed, who was responsible for developing the code that had to do with RACH access, which was what they accused of infringement, never asked them, what about this document? What was the circumstances of it? What was it applying? When it says, it could be considered, who would consider it? And so, as we said before, and as the district court appreciated, it's not necessarily about this patent. It's a different patent in another country. Whether it's related or not, it's about different standards in that country. And we shouldn't penalize Qualcomm for looking at something and realizing, well, gee, if there's this patent litigation in Germany, and we want to make sure our customers are protected, if it could be considered equivalent, there's an easy design around, so we'll let everyone know. That's not an admission. And it's also not an admission by a party opponent, because Qualcomm is not the defendant in this case. I realize that I'm probably out of time, so unless there's any other questions. I think you are. Thank you, Mr. Howell. Thank you. Mr. Stockwell, you have two minutes here. Thank you, Your Honor. How do you respond to that last point? You called it an admission, but it can't be an admission since Qualcomm is not a party. Well, Your Honor, Qualcomm is the supplier of the code, so I wouldn't say they were identified with HTC. At the end of the day, it's still admissible evidence from someone that's skilled in the art and design of the code. So I don't think the district court found that it was inadmissible evidence. She simply discounted the weight of the evidence. So let me respond to a couple of points and just focus us back on the record. So counsel said we could not have been surprised because the district court relied on Dr. Stark's testimony that, hey, phase course is a series of calculated phase angles. But Dr. Stark also testified, and we submitted this to the district court at A6625, about why he believed the devices were nonetheless utilizing phase course. Counsel's question was, again, this was not utilizing phase values, correct? The witness. The first is utilizing phase values. There is a one-to-one relationship between I and Q and magnitude and phase. And he goes on to explain that. So it's not that it is not using the phase value. It is using the phase value. The phase is actually an intimate part of this. If you look at the equation, he cites the equation that is used in the accused phones. What that is doing is basically doing a phase difference between the two complex pairs. And then he goes on and says each of those complex pairs has a corresponding representation in terms of magnitude. There's a difference between using phase values and using a phase course, is there not? That's exactly his point, is that the accused phones used the phase course. They didn't have to calculate the phase values in order to do that. That was the evidence we submitted to meet the construction. Counsel also said that, well, we could not have been surprised by what the district court did, but I would refer the court to page A70. HTC proposes that synchronizing means bringing a mobile station's operation in step by performing processes that evaluate a continuously running phase angle calculated from birth signals. And the district court at A71 and 72 says, I'm not adopting that construction. That was what was in the Markman order. Later, she said, no, you did have to calculate phase angles. Similarly, at page A84, counsel misspoke. 3.2, they did propose that the district court adopt the same burst argument for that. Okay. I think we're out of time. Thank you. Thank you, Your Honor. Thank you very much. The case is submitted. Now, with respect.